**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.:  13-168-2 (EGS)** |
| | : | |
| **v.** | : | |
| | : | |
| **BINH TANG VO,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |

<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

Defendant BINH TANG VO ("BINH VO") has pled guilty to offenses of conspiracy to commit bribery and visa fraud and to defraud the United States, in violation of 18 U.S.C. § 371, bribery of a public official, in violation of 18 U.S.C. § 201(b)(1), and conspiracy to engage in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. §§ 1957 and 1956(h), arising out of his masterminding a massive bribery visa fraud and money laundering scheme from Ho Chi Minh City, Vietnam.  Between February and September 2012, BINH VO and his co-conspirators created or submitted approximately 500 fraudulent visa applications, approximately 489 of which were subsequently approved.  BINH VO's illegal conduct allowed hundreds of aliens to enter the United States without proper scrutiny by an unbiased consular officer.   In fact, of the applicants who were approved for visas, most traveled to the United States and subsequently applied for benefits from the United States Citizenship and Immigration Service; and many others traveled to the United States and have not left the United States. The defendant's participation in this multi-million dollar scheme impacted both the national security and foreign policy interests of the United States.  The conspiracy created a gaping hole in the system designed to screen people seeking entry into the United States.

The Probation Office has determined that BINH VO's guideline offense level is 38. His base offense level is 36. U.S.S.G. § 2S1.1(a)(1). A one-level enhancement is applicable pursuant to U.S.S.G. § 2S1.1(b)(2)(A) because the defendant violated 18 U.S.C. § 1956(h) (money laundering). Because the defendant was an organizer or leader of a criminal activity involving five or more participants, his base offense level is increased by four levels pursuant to U.S.S.G. § 3B1.1(a). The resulting offense level is 41. The government agrees that the defendant has accepted responsibility for the offenses of conviction, decreasing the offense level by two pursuant to U.S.S.G. § 3E1.1(a) . The government further agrees that the defendant provided timely notice to the government of his intention to plead guilty, thus the government hereby moves this Court for one additional level reduction pursuant to U.S.S.G. § 3E1.1(b). Therefore, the defendant's adjusted offense level is 38, and the resulting sentencing range is 235 to 293 months. The parties have agreed that a sentencing range of 6 to 8 years is the appropriate sentence in this case. For the reasons stated herein and for any additional reasons offered at the sentencing hearing, the government requests that the defendant be sentenced to 8 years of incarceration followed by 3 years of supervised release, and that the defendant be ordered to forfeit $5,099,018.01.

## I.    BACKGROUND

This is a case of almost unprecedented greed. In a mere seven months, the defendant presided over a conspiracy that obtained what is conservatively estimated to be at least $9.7 million in bribes to grant visas to almost 500 Vietnamese citizens who likely would not have been able to lawfully enter the United States were it not for this conspiracy. The defendant then worked in concert with his co-conspirators to execute a complicated money laundering scheme that resulted in the ill-gotten proceeds becoming nearly untraceable. As a result of the

government's investigation, only $3.1 million of the defendant's illegal proceeds has been seized to date, most of which has come from bank accounts of the defendant and his family members, in which the defendant attempted to conceal the proceeds of the scheme.  The government believes that the defendant still has access to millions of dollars in Vietnam and/or China, outside of the reach of the government.  The defendant has agreed to the entry of a consent order of forfeiture that will result in the forfeiture of the funds seized to date, as well as the forfeiture of an additional $2 million, to be paid within one year of sentencing in this matter.  The defendant was the last of the charged conspirators to accept responsibility for his actions.[1]

### A.      Summary of the Fraudulent Visa Scheme Operation

In 2012, the Diplomatic Security Service ("DSS") of the U.S. Department of State began to investigate U.S. Foreign Service Officer (and co-defendant) Michael Sestak for participating in a visa fraud scheme in which he received bribes in exchange for approving visas from Vietnam to the United States.  The investigation revealed that Sestak used his position as the Chief of the Non-Immigrant Visa Unit at the U.S. Consulate Ho Chi Minh City, Vietnam, to approve fraudulent visa applications from at least March 2012 through September 2012, at which point Sestak left his post.  Defendant BINH VO then laundered Sestak's proceeds from the conspiracy by moving the money from Vietnam to China to Sestak's bank accounts in Thailand.

BINH VO came up with the idea for the fraudulent visa scheme and approached Sestak with the idea. Sestak agreed to approve non-immigrant visas ("NIVs") for applicants for a fee. Defendant BINH VO and his co-conspirators had "agents" working to recruit customers – or to

---

[1]  Three of the defendant's co-conspirators have entered guilty pleas:  Sestak, the consulate official; Hong Vo, the defendant's sister, and Truc Huynh, the defendant's cousin, middleman and runner. A fourth co-defendant, Anhdao T. Nguyen also known as Alice Nguyen, who is the defendant's wife, remains at large.  Pursuant to the plea agreement, the charges against Anhdao Nguyen will be dismissed at the defendant's sentencing.   Herein after, she will be identified as Conspirator A.

recruit other recruiters – for the scheme. The defendant and his co-conspirators reached out to people in Vietnam and in the United States, and advertised that "the deal" was being facilitated by a "lawyer" who could guarantee visas for people to come to the United States. Defendant BINH VO and his co-conspirators also emphasized that the "lawyer" could get visas for people who generally would not be able to get visas on their own, such as people who had been previously refused visas, people who resided in the countryside, and people who had not traveled outside of Vietnam.[2] The defendant and his co-conspirators would then obtain biographical data and photos from customers and prepare their visa applications for them. They would submit the customers' applications online from one of three Internet Protocol ("IP") addresses associated with the defendant and schedule appointments for interviews at the Consulate. They would also assist people in preparing for NIV consular interviews by providing sample questions and answers. Soon after submitting the visa application – typically three days or less – the customer would receive an appointment at the Consulate, be interviewed by Sestak, and be approved for a visa.

Defendant BINH VO and his co-conspirators advertised that the charge would be between $50,000 and $70,000 per visa, though they would sometimes charge less. They also advertised that once the customers were in the United States, they could enter into what are known as "sham marriages" and apply for permanent legal residence, they could travel easily to and from the United States in the future, or they could simply travel to the United States and "disappear." They encouraged recruiters to raise the price and keep the amount they charged over the established rate as their own commission. Customers would pay for their visas in

---

[2] The investigation has uncovered no evidence of any attorney being involved in the effort to acquire visas. The promise of attorney involvement was used by the conspirators to provide legitimacy to a scheme designed to prey on the ignorance and desperation of the Vietnamese customers who were willing to pay exorbitant bribes to escape the harsh living conditions and lack of opportunities that many of the applicants faced in Vietnam.

Vietnam or by routing money to defendant BINH VO's accounts (or his family's accounts) in the United States.  The defendant received several million dollars in bribes for his role in managing the scheme and securing the visas.  For the money paid to the defendant in Vietnam, the defendant laundered some of this money though off-shore banks, primarily in China, and also through bank accounts in the United States that were in the defendant's name or the names of his family members. The defendant also spent some of the proceeds on luxury goods and a lavish lifestyle for himself and his wife.  Moreover, the defendant moved Sestak's share of the criminal proceeds out of Vietnam, through banks in China and elsewhere, to a bank account in Thailand that Sestak opened in May 2012 for that purpose.

In total, the defendant and his co-conspirators prepared and submitted visa applications for approximately 500 "customers" of the fraudulent visa scheme, and earned millions of dollars in exchange for guaranteeing that the applicants would obtain visas through the Consulate.   A conservative estimate of the total sum of unlawful proceeds generated by the scheme is at least $9.7 million.   The government has been able to locate only approximately $3.1 million of proceeds at financial institutions in the United States.  The government also traced approximately $3.2 million in proceeds that BINH VO transferred from Vietnam to Thailand for Sestak who then invested in real estate.   Millions of dollars in proceeds remain overseas and outside the reach of the United States.

**B.     The Fraudulent Visa Applications Were Associated with Three IP Addresses, All of Which Were Associated with the Defendant.**

All NIV applications are submitted electronically via the Department of State's Consular Electronic Application Center ("CEAC").  The IP address from which an applicant accesses the CEAC is captured and retained both at the time an application is first created and when it is submitted.  Therefore, for every application submitted through the CEAC, there are up to two

associated IP addresses.

DSS review of Consulate records revealed that over 500 of the applications adjudicated by Sestak during the course of the conspiracy were accessed from one of three IP addresses (hereinafter "Suspicious IP Addresses").   Further investigation showed that these three Suspicious IP Addresses were connected to Defendant BINH VO ("IP Address A"), his sister (co-defendant Hong Vo) ("IP Address B"), his wife (Conspirator A) and her family ("IP Address C").

The Consulate's records revealed that approximately 425 applications (for 419 unique applicants)[3] were accessed from either IP Address A or IP Address B, between March 8, 2012, and September 6, 2012.  Sestak conducted the initial interview for 404 of the 425 applicants and approved visas for 386 of them. Sestak tried to issue visas to an additional 11 of the 404 applicants that he initially interviewed, but the system kicked back the applications due to certain data mismatches; all of the applications were ultimately re-adjudicated and approved by other officers without further interviews.  Sestak issued "soft refusals,"[4] to 4 of the 404 applicants that he initially interviewed because they were missing documentation or had not paid certain fees to the United States required for their specific visa classes; these four applicants were subsequently issued visas by other consular officers.   In contrast, of the remaining 15 applicants who were initially interviewed by other officers, 13 were refused visas.  Sestak overturned one of these 13 refusals; and 6 of these 13 applicants subsequently submitted new visa applications which were subsequently approved by Sestak.  Moreover, Consulate records revealed that Sestak also had a pattern of approving NIVs from IP Address C.  A total of 80 NIV applications had been created

---

[3]  Several of the 419 visa applicants submitted more than one visa application.

[4]  When an applicant receives a soft refusal, the applicant can have the visa re-adjudicated without having to submit a new application.

or last accessed from this address between February 1, 2012, and September 6, 2013.  Sestak interviewed and issued visas to 75 of these 80 applicants.

BINH VO was directly associated with all three of these IP Addresses. First, IP Address A was the internet connection from the defendant's office.  At the time of the offense, the defendant was working as General Director of the Vietnam office of Company A, a private international moving and relocation company.  Company A has confirmed that IP Address A was from an internet connection at the defendant's office at Company A.  This is corroborated by IP Address logs, which show that the defendant repeatedly and consistently accessed his personal email from IP Address A.

Second, with respect to IP Address B, a review of records on the American Registry for Internet Numbers ("ARIN") website revealed that IP Address B was assigned to Black Oak Computers Inc. ("Black Oak"), an Internet Service Provider ("ISP") with headquarters in California.  Records obtained from Black Oak revealed that a single Black Oak Virtual Private Network ("VPN")[5] account was used to access 408 NIV applications, and that the subscriber on this account was co-defendant Hong Vo, the defendant's sister.   The address listed for Hong Vo's account at Black Oak was the same address in Denver, Colorado ("Denver Address") and as the Google e-mail address that included Hong Vo's first and last name.  Department of State passport records also revealed that Hong Vo listed the same Denver address on her U.S. passport application in 2006.

Defendant BINH VO also used this Black Oak VPN Account.  In a Google chat, dated

---

[5]  A VPN is a technology that isolates one computer's traffic to another computer's traffic by creating an encrypted tunnel between two computers.  By using a VPN, a person can route all of his traffic to the Internet through a second computer, thereby making it appear that he is accessing the Internet directly from the second computer.  Some websites block traffic coming from certain IP addresses or certain countries.  In order to circumvent such blocks, a user can use a VPN connection through an IP address or country that is allowed to visit the blocked website.  Once a user establishes his Internet connection through the VPN, all of his traffic will appear to originate from the ISP that hosts the VPN.

July 10, 2012, recovered from a court-authorized search warrant executed on Hong Vo's Google Account, the defendant wrote to Hong Vo: "VPN has not been working all night, what's up w/ that?"  Hong Vo replied that the defendant should try again and that the VPN was working.

Finally, IP Address C was associated with the defendant's in-laws in Vietnam.  The defendant and his wife repeatedly accessed their personal e-mail from this IP address as well, and other court-authorized search warrants executed on the e-mail account confirm that this address was associated with the defendant's in-laws in Vietnam.  Records provided by the Vietnamese government through official channels corroborated that IP Address C was assigned to the home of the defendant's in-laws.

**C.     The Defendant Purposefully Cultivated a Relationship With Sestak in Order to Recruit Him To Approve Visas For the Conspiracy.**

The defendant orchestrated the visa fraud conspiracy from beginning to end.  During the summer of 2011, according to electronic communications between the defendant's sister and another co-conspirator, the defendant cultivated a relationship with Sestak in order to get Sestak to approve visas for their family and acquaintances.

In a Google chat dated June 1, 2011, co-defendant Hong Vo stated to an acquaintance:

> [L]ast night we went out with this guy who works at the consulate — he's the one that approves peoples visas… and he's this single guy who wants to find someone to be wth [sic]… and my brother knows that - so he's been trying to get this guy out and introduce him to people… so then later he can do him favors like … have him approve visas for people."

In an email dated June 1, 2011, co-defendant Hong Vo stated to her boyfriend:

> This guy who works for the US consulate here came out and joined us for dinner.  He's the guy that approves Visas for Vietnamese people to go to the United States so he's a really good connection to have.  My brother plans on using him to get [a sister-in-law's] Visa to go to the States so [the sister-in-law] will most likely travel back with me in August . . . he just likes to people watch -- he does

this with the consulate guy (Mike) and they check out girls.

In a Google chat dated June 27, 2011, co-defendant Hong Vo again discussed the sister-in-law referenced in the above paragraph.

> I applied for her Visa…so her interview is July 13th . . . and i told the consulate guy . . . so he said he'll pull her file . . . but now he knows our family . . . so he's more trusting . . . but she'll most likely get accepted this time . . . because Mike will pull up her file . . . and he considers Binh like his best friend.

In another Google chat dated June 27, 2011, co-defendant Hong Vo discussed Sestak:

> I have to go out now.. it's freaking 11P and Binh  forgot it was Mike's birthday…this loser guy  who works for the consulate but we have to go out because he's going to help us get [the sister-in-law's] visa  ugh

On October 24, 2011, Sestak approved an NIV for the defendant's wife.  The following day, the defendant had the following Google chat with Sestak:

> BINH VO:  thanks for Alice's visa and sorry about the application; she wasn't sure if she had to fill it out, etc.; hence, she asked you in her email.  Great that you handled everything, which is greatly appreciated.
> SESTAK:  no worries.  I will fedex it back to her address in austin, right?
> . . .
> SESTAK:  Ok I will send it tomorrow at lunch after they print the visa.
> BINH VO:  Alice Nguyen . . . 13730 FM 620N, #1010 . . . Austin, Texas 78717.

These communications show that the defendant actively cultivated a relationship with Sestak in order to take advantage of his position at the Consulate.  The defendant turned this relationship into millions of dollars for himself and Sestak.

### D. The Defendant Used Anonymous Email Accounts, Aliases, and Middlemen to Disguise his Participation in the Visa Fraud Conspiracy

The defendant and his co-conspirators created a number of anonymous email accounts

(with accompanying standardized passwords) (hereinafter "Shell Email Accounts") to execute the scheme.   A court-authorized search of the defendant's primary email account revealed an email listing 11 separate email addresses and what appeared to be their passwords.   The Shell Email Accounts were used to receive biographical information for visa applicants, including scans of identity documents and visa photos, as well as to communicate with other members of the conspiracy.   The Shell Email Accounts were also used to receive interview appointment confirmations from the Consulate and to email visa photos, appointment confirmations, or biographical information for visa applicants to other members of the conspiracy.   In total, information was sent to or from the Shell Email Accounts for approximately 258 individuals who obtained visas during the course of the conspiracy.   Of those 258 individuals, 251 were initially interviewed by Sestak, and Sestak issued visas to 242 of the applicants.

Additionally, the defendant employed a middleman or a "runner" to work directly with the agents who recruited customers for the conspiracy.   This runner, co-defendant Truc Thanh Huynh (who entered a guilty plea), assisted the defendant in formatting biographical information for visa applications, met with customers to collect their payments, and coached applicants in preparation for their consular interview.

In a Google chat dated June 28, 2012, defendant BINH VO discussed Huynh's role with one of his siblings.   The defendant stated,   "[Truc]'s my runner now and deals w/ all the agents, etc., and I specifically told her not to tell ANYONE.   I got her a US visa also already."   The sibling told the defendant that it was easier for the scheme to target Vietnamese-Americans because, "they have money and are desperate to bring their relatives over."   The defendant responded:   "that's fine, have them call Truc and say who refer[red them]."   Consistent with the defendant's use of anonymous email accounts, he then wrote: "her name is Thanh.   Truc =

Thanh.  We all have different names."  Truc's shell e-mail account included the name "Thanh." The defendant told his sister: "and your name is Phuong" and people should use that name to refer her, "so that I know they are your leads."  Finally, the defendant writes:  "Price is 50-70 depending on the case, so you have to tell them ahead of time to see if they have the dought [sic] to do . . . they can pay either in the USA or VN.  Will only do this until mid-Sept, then call it quits."

### E.    BINH VO's  Financial Transactions

As part of his plea agreement, BINH VO has agreed to forfeit an additional two million dollars of his illegal proceeds, in addition to the funds already seized by the government, yet he maintains to the probation department and this Court that his net worth is less than one million dollars.   This is not credible.

During the conspiracy, BINH VO and Sestak agreed that BINH VO would charge $10,000 to $20,000 per visa and then BINH VO would split the proceeds evenly with Sestak. But BINH VO and his relatives boldly advertised that for $50,000 to $70,000, they could obtain visas to the United States and offered a money-back guarantee.[6] DSS interviews with applicants still residing in the United States who obtained visas from the conspiracy admitted to paying as much as $73,000 for their visas.  BINH VO made many millions more than the approximately $3 million he paid to Sestak.  In a conversation with her sister, Conspirator A.V., on July 25, 2012, Hong Vo stated, "I can't believe Binh has pretty much made over $20m with the business." Hong Vo also explained that "slow days… are like 3 clients… and that's like 160k-180k."  Hong

---

[6]   Assuming 489 visas at $20,000 each would result in total proceeds of $9,780,000.  This is an extremely conservative estimate because the evidence indicates that BINH VO and his co-conspirators actually charged much more than $20,000 per visa.  At least one visa applicant told the government that she paid $73,000 for her visa, at least two applicants stated that they paid $60,000 for their visas, at least two applicants said that they paid $50,000 for their visas, and numerous applicants stated that they paid $30,000 to $35,000 for their visas.  This would make the proceeds of the scheme well beyond $9,780.000.

Vo went on to say that "he's been doing this for the past 3 months… busy days are like 10-15." Hong Vo explained that she knew this because she "talked to Truc… that's how much she brings home… in cash on a daily basis… she's collecting right now too… she gives it to Binh."  Hong Vo also explained, "when alice was telling me about… how she was uneasy why mom was here… for dv[7] stuff… and how she didn't want our parents to be involved… well her parents are doing it too!" Hong Vo continued: "she thought it was pointless for mom to be here… and she didn't like that binh let mom come… but she told me that… her parents… weren't doing anything with dv… and that they said it was too risky… and that's when she told me she bought flights for her and binh to get out of the country if anything blew up."  Hong Vo also expressed concern regarding the defendant: "i hope binh doesn't lose all the $$ he makes though… because he tends to not be careful when it comes to that stuff… well, buying the apartment with alice isn't really smarter."

### The Defendant Laundered Millions of Dollars of Proceeds of the Visa Fraud Conspiracy through International Accounts

As the conspiracy earned up to $50,000 to $70,000 per applicant, BINH VO sought opportunities to launder his new found wealth and also to help his partner, Sestak, launder his proceeds as well.  Between June 25, 2012, and September 6, 2012, 39 transfers totaling $2,999.400.18 were made into Conspirator A's Wells Fargo Checking Account.  The majority of these deposits came from accounts with the Bank of China in Beijing, China.  Similarly, between June 20, 2012, and September 11, 2012, Sestak received 35 transfers totaling approximately $3,238,991.43 into his account with Siam Commercial Bank PLC located in Bangkok, Thailand. The majority of the transfers came from accounts at the Bank of China; some of the accounts were the same ones that had deposited some of the $2.99 million into Conspirator A's Wells

---

[7]  dv refers to  David Visa, which was BINH VO's code name in the fraudulent visa scheme.

Fargo account. The funds in Conspirator A's Wells Fargo checking account were later transferred into a Scottrade account held in Conspirator A's name ("the Scottrade account").

The government's investigation also revealed further evidence of the defendant's intent to conceal funds internationally. Specifically, in a Google chat between the defendant and a sibling on April 9, 2012, the defendant said he had a customer who wanted to pay in the United States, "and if so, I will have that person transfer money to your bank account." The defendant then told his sibling: "[Y]ou should open a USD account at Vietcombank to be safe as HSBC can be checked by US gov't . . . Just to be safe, you should not have over $10 grand in your HSBC account, but you can in the Vietcombank account."

### The Defendant Also Laundered His Proceeds by Organizing Deposits in Multiple Bank Accounts in the United States Associated with the Defendant and His Family.

In addition to laundering funds internationally, the defendant also sought to send some of the proceeds from the scheme in Vietnam to accounts here in the United States that were associated with himself and with his family members. In a Google chat dated April 9, 2012, the defendant asked for the Wells Fargo bank account details for his sister, co-defendant Hong Vo:

> BINH VO: Give me your full bank details
> HONG VO: Wells Fargo Account Number: [XXXXXXX]410
> BINH VO: full name on account, swift code, etc.
> HONG VO: Routing Number: [XXXXXX]882
> HONG VO: Hong Chau Vo
> HONG VO: no swift code — just the routing number
> BINH VO: address of bank
> BINH VO: you can check your account online any time, right?
> BINH VO: Wells Fargo Bank, N.A. (163)
> P.O. Box [XXXX]
> Denver, CO 80274
> HONG VO: yea
> HONG VO: why do you need this information?
> BINH VO: just in case I need people to transfer money into your account so that you can keep the cash there for me

HONG VO: lol I'm going to SPEND IT ALL!!!

BINH VO: I will kill you

HONG VO: lol I only have $2k in there right now so it's cool. More won't hurt ;)

HONG VO: hahahaha

BINH VO: benefit for you is that if I decide to buy an investment property, then you can be co-name so that you can build up equity

BINH VO: will depend on the clients, if they want to transfer money to pay in the USA or here

Consistent with this conversation, the investigation uncovered a number of structured deposits into United States bank accounts of the defendant, joint accounts that the defendant shared with family members, and the defendant's family members.

### BINH VO's JP Morgan Chase (JPMC) Savings Account

On May 18, 2012, defendant BINH VO received eight cash deposits, totaling an aggregate of $60,000 to this account. Each deposit was less than $10,000, and each deposit was made at a separate JMPC banking branch in Michigan, as detailed in the chart below:

| Date | Bank | Amount | Bank Branch Address |
|------|------|--------|---------------------|
| 5/17/2012 | JPMorganChase | $ 8,000.00 | 29700 Van Dyke Rd Warren, MI |
| 5/17/2012 | JPMorganChase | $ 8,000.00 | 5601 Metropolitan Pkwy Sterling Heights, MI |
| 5/17/2012 | JPMorganChase | $ 8,000.00 | 33051 Schoenherr Rd Sterling Heights, MI |
| 5/17/2012 | JPMorganChase | $ 8,000.00 | 13999 Lakeside Circle Sterling Heights, MI |
| 5/17/2012 | JPMorganChase | $ 8,000.00 | 43101 Garfield Rd Clinton Township, MI |
| 5/17/2012 | JPMorganChase | $ 6,000.00 | 30730 Groesbeck Hwy Roseville, MI |
| 5/17/2012 | JPMorganChase | $ 8,000.00 | 20851 Hall Rd Macomb MI |
| 5/17/2012 | JPMorganChase | $ 6,000.00 | 21700 21 Mile Rd Macomb, MI |

On May 21, 2012, defendant BINH VO received an additional 11 cash deposits, totaling an aggregate of $85,000 into this same account. The individual deposits were all made in sums

of less than $10,000 at six different JPMC branches in Michigan, as detailed in the chart below:

| Date | Bank | Amount | Bank Branch Address |
|------|------|--------|---------------------|
| 5/21/2012 | JPMorganChase | $ 8,000.00 | 29700 Van Dyke Rd Warren, MI |
| 5/21/2012 | JPMorganChase | $ 8,000.00 | 29700 Van Dyke Rd Warren, MI |
| 5/21/2012 | JPMorganChase | $ 8,000.00 | 5601 Metropolitan Pkwy Sterling Heights, MI |
| 5/21/2012 | JPMorganChase | $ 6,000.00 | 26363 Woodward Ave Huntington Woods, MI |
| 5/21/2012 | JPMorganChase | $ 8,000.00 | 26363 Woodward Ave Huntington Woods, MI |
| 5/21/2012 | JPMorganChase | $ 8,000.00 | 33051 Schoenherr Rd Sterling Heights, MI |
| 5/21/2012 | JPMorganChase | $ 8,000.00 | 33051 Schoenherr Rd Sterling Heights, MI |
| 5/21/2012 | JPMorganChase | $ 7,000.00 | 30730 Groesbeck Hwy Roseville, MI |
| 5/21/2012 | JPMorganChase | $ 8,000.00 | 28824 Dequindre Rd Warren, MI |
| 5/21/2012 | JPMorganChase | $ 8,000.00 | 28824 Dequindre Rd Warren, MI |
| 5/21/2012 | JPMorganChase | $ 8,000.00 | 28824 Dequindre Rd Warren, MI |

The defendant received an additional series of 13 cash deposits, totaling $100,000, to the same account on May 22, 2012.  The individual deposits were all made in sums of less than $10,000 at twelve different JPMC branches in Michigan, as detailed in the chart below:

| Date | Bank | Amount | Bank Branch Address |
|------|------|--------|---------------------|
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 29700 Van Dyke Rd Warren, MI |
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 25800 Coolidge Ave Huntington Woods, MI |
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 5601 Metropolitan Pkwy Sterling Heights, MI |
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 26363 Woodward Ave Huntington Woods, MI |
| 5/22/2012 | JPMorganChase | $ 4,000.00 | 33051 Schoenherr Rd Sterling Heights, MI |
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 33051 Schoenherr Rd Sterling Heights, MI |

| Date | Bank | Amount | Bank Branch Address |
|------|------|--------|---------------------|
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 13999 Lakeside Circle Sterling Heights, MI |
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 43101 Garfield Rd Clinton Township, MI |
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 260 John R Troy, MI |
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 30730 Groesbeck Hwy Roseville, MI |
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 28824 Dequindre Rd Warren, MI |
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 20851 Hall Rd Macomb, MI |
| 5/22/2012 | JPMorganChase | $ 8,000.00 | 21700 21 Mile Rd Macomb, MI |

The person who made a majority of the deposits was interviewed by DSS agents and stated that the deposits were made on behalf of customers of the fraudulent visa scheme. The person further stated that someone in Vietnam who identified himself as "David" directed the scheme and instructed him to make the deposits in amounts less than $10,000.[8]   Phone records revealed that the Vietnamese phone number "David" used to communicate with the person was the same phone number that the defendant admitted to using in furtherance of the conspiracy in his Statement of Facts in Support of a Guilty Plea. In the same Statement of Facts, the defendant admitted to using the code name "David" when communicating regarding the conspiracy.

### BINH VO and Sibling Joint JPMC Account

Between April 23, 2012, and May 14, 2012, the defendant and one unindicted sibling received seven cash deposits, totaling $53,000, to their JPMC joint checking account. All but

---

[8] Financial institutions are required to file a Currency Transaction Report ("CTR") for deposits, withdrawals, or transfers of funds through, to, or from the institution that exceed $10,000. A person attempting to avoid the CTR filing, so as not to draw unwanted attention, will often structure his deposits so that no single transaction exceeds $10,000; and make deposits at different branches of the same financial institution.

one of these deposits was less than $10,000, and the seven cash deposits were made at six separate JPMC branches in Michigan, as detailed in the chart below:

| Date | Bank | Amount | Bank Branch Address |
|------|------|--------|---------------------|
| 4/23/2012 | JPMorganChase | $   8,000.00 | 33051 Schoenherr Rd Sterling Heights, MI |
| 4/26/2012 | JPMorganChase | $ 10,000.00 | 13000 West McNichols Detroit, MI |
| 5/3/2012 | JPMorganChase | $   9,000.00 | 29700 Van Dyke Rd Warren, MI |
| 5/3/2012 | JPMorganChase | $   9,000.00 | 33051 Schoenherr Rd Sterling Heights , MI |
| 5/3/2012 | JPMorganChase | $   7,000.00 | 28824 Dequindre Rd Warren, MI |
| 5/14/2012 | JPMorganChase | $   5,000.00 | 25800 Coolidge Ave Huntington Woods, MI |
| 5/14/2012 | JPMorganChase | $   5,000.00 | 26363 Woodward Ave Huntington Woods, MI |

During this same period of time, the government's investigation revealed additional structured payments to two other Vo siblings' bank accounts at JPMC branches in Michigan.

The defendant also sought to have the proceeds stored in cash at his parent's home here in the United States.  In an email from the defendant to a sibling on May 20, 2012, the subject of which was "Buy a safe," the defendant wrote: "Do me a favor & go buy a 300 lbs safe & put it in mom's closet for me.  Only you & I will know the combination of the safe."  The defendant went on to write: "ask mom to go deposit in 9 increments of $9 grand into my Binh T. Vo JP Morgan Chase Savings account [XXXXXXX]5536 . . . I do not want the cash to be lying around at home."

### BINH VO and his Wife Withdraw Millions of Dollars As Government Moves In

Beginning on or about March 26, 2012, BINH VO's wife, Conspirator A, opened a

17

number of term savings accounts with deposits of cash[9] at Vietcombank in Vietnam.  On or about May 25, 2012, BINH VO and/or his wife Conspirator A opened a number of term savings accounts with deposits of cash at Sacombank, in Vietnam.

On May 6, 2013, Sestak was detained in Thailand.  On May 7, 2013, United States Magistrate Judge Alan Kay issued a seizure warrant for any and all funds on deposit, up to $200,000, in the Scottrade account.  See 13-MJ-344.  The funds were frozen on that date.  On May 8, 2013, co-conspirators Hong Vo and Truc Huynh were arrested in the United States.  On May 8, 2013, Conspirator A called Scottrade regarding the status of the Scottrade account and was informed that the funds had been frozen.  On May 9, 2013, Magistrate Judge Kay issued another seizure warrant for any and all funds and securities held in the Scottrade account.  See 13-MJ-359. This resulted in an additional seizure of $2.7 million.[10]

On May 10, 2013, Conspirator A started closing the term savings accounts in Vietnam, withdrawing approximately $7.8 million. The records revealed that between May 10 and May 13, 2013, 26 term savings accounts worth 162,817,220,284 VND were closed.  In U.S. dollars, these accounts were valued at $7,717,941.  See Exhibit 1. Once the term savings accounts were closed, it appears the funds were withdrawn in cash or transferred to Vietcombank account number XXXXXXX8470.  Thus, after Sestak was arrested, and after the illegal proceeds in the United States had been seized, BINH VO and/or his wife, Conspirator A, moved over $7.7 million dollars in 3 days.

---

[9]  On one occasion, the initial deposit to open a term savings account was a transfer of funds, $43,500, from Vietcombank account XXXXXXX-XXX.X.XX.XX33565.  This account consisted of BINH VO's salary payments from his employer.

[10] Upon liquidation, the value of the Scottrade account was $2,900,818.88.

In addition, between May 10, 2013, and May 14, 2013, cash totaling 99,092,206,994 VND, ($4,734,460), was deposited into Sacombank account number XXXXXXXX9918 ("Account 9918"), and 99,237,400,000 VND, ($4,741,400), was withdrawn from this account in cash, leaving a balance of 19,532,214 VND, which is the equivalent of $933.21.[11]  It is possible that some or all of the cash withdrawn from the 26 term savings accounts between May 10 and May 13, 2013, was deposited into Account 9918.  However, after May 14, 2013, there was minimal activity in Account 9918.  With the exception of one deposit on June 26, 2013, in the equivalent amount of $580, the transactions consisted of deposits of interest and withdrawals for account service fees.  As of July 31, 2014, the balance in this account was the equivalent of $0.23.

### BINH VO and Conspirator A Used the Illegal Proceeds to Fund a Lavish Lifestyle

The defendant and Conspirator A maintained a lavish lifestyle on the proceeds from the visa fraud scheme.  As the cash came in they spent it living large, purchasing real estate, furnishings, contracting with high end design firms for  elaborate renovations of apartments in the luxury Saigon Pearl and exclusive Xi River Palace condominium complexes.  See Exhibits 2-5.  BINH VO told Sestak that he purchased an apartment in the Xi Riverview Palace in Vietnam for $400,000 to $500,000. When the defendant purchased the apartment in May 2012, the actual cost was $449,945 and $8,875 was paid for the maintenance fund.  The contract included gym membership and bi-weekly tennis vouchers for a year.  See Exhibits 6-7.  Sestak actually saw the apartment that BINH VO and his wife were going to occupy.  BINH VO told Sestak that he later purchased a penthouse in the same building.  BINH VO told Sestak that the asking price was $1.2 million and he offered $1 million for the penthouse.   BINH VO also attempted to conceal

---

[11]  The balance in Account 9918 on May 6, 2013, was 164,725,049 VND, or the equivalent of $7,874.

illegal proceeds of the conspiracy by purchasing furnishings and other expensive items for the condominiums.  Conspirator A received a furnishing quote for $177,468.  They contracted with interior designers to build a Marine aquarium and cabinet to hold the elaborate extravagant show piece.  See Exhibits 8-11.

In a chat with his wife on August 1, 2012, about moving money, the defendant said "did you talk to HSBC about opening a premier account here and then one in Sing. as well as another in the USA?"  Conspirator A replied "I did we just need to put the money in."  Binh Vo said "have the home base country as VN as the requirement is only 1 bil VND (US$ 50 grand)  Ok, go put the money in then   that way, we can have cash to many banks and locations to be safe."  Conspirator replied "agree!"  Binh Vo replied "for HSBC, just open under your name, no joint account w/my name OK"   Conspirator A replied "let me check with them to see if its ok to have it under just your name."  Binh Vo replied:  "no…no…no… **I don't want to open a western bank account w/my name**"   (Emphasis added).

Between September and October of 2012, defendant BINH VO and his wife traveled for 23 days to Hong Kong, Seoul, and Tel Aviv.  Also in September 2012, BINH VO paid the equivalent of $6,000 to repair a rose gold cell phone that retailed for $38,000.  See Exhibits 12-13.  In November 2012, BINH VO and Conspirator A hosted an elaborate Vietnamese wedding.  See Exhibits 14-16.  From October 1, 2012, to November 27, 2012, there were 6 wire transfers to a jeweler in the amount of $547,800.  The invoices indicate assorted 18 K gold, diamond and other colored stones including "showcase" pieces purchased by BINH VO's wife, Conspirator A.  See Exhibits 17-22.

On October 13, 2012, a term savings account, account number XXXXXXX-XXX.X.XX.XXX8969 ("8969"), controlled by Conspirator A was closed.  The value at the time

of closure was $503,395.94.  Of this amount, approximately $103,395.94 was transferred to a new term savings account, XXXXXXXX9939.  The remaining $400,000 may have been used to pay for the jewelry.

In 2012, BINH VO's Delta Sky Miles American Express card revealed charges totaling $112,443.  In the year prior to the conspiracy, BINH VO's Delta Sky Miles American Express credit card charges were $27,994.  BINH VO and Conspirator A were also issued three credit cards by Sacombank.  At least one of the cards was only issued to customers whom the bank deemed to be VIPs.  In 2012 and 2013, BINH VO and Conspirator A paid for purchases totaling approximately $160,000 with the Sacombank credit cards.  In particular, between April 1 and April 7, 2013, based on a review of credit card records related to account XXXX-XXXX-XXXX-1706, it appears that BINH VO and his wife travelled to Dubai.  During this period of time, credit card transactions totaling 1,499,056,943 VND, the equivalent of $70,573, occurred in Dubai.  A review of credit card records related to XXXX-XXXX-XXXX-3060, between August 23 and August 26, 2012, it appears that BINH VO and his wife travelled to Bangkok.  During this period of time, credit card transactions totaling 518,220,375 VND, the equivalent of $24,448, occurred in Bangkok.

## II.   ARGUMENT

In accordance with 18 U.S.C. § 3553(a), the United States Sentencing Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 552 U.S. 85, 92 (2007), it remains the case that "the [Sentencing] Commission fills an important  institutional role:  It has the capacity courts lack to 'base its determinations on empirical data and national expertise,

guided by a professional staff with appropriate expertise."  Gall v. United States, 552 U.S. 38 (2007).

When weighing the  § 3553 factors as part of its calculus of an appropriate sentence, the Court  should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives – that is, that the sentence should:  (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed education or vocational training and medical care. See 18 U.S.C. § 3553 (a)(1) and (2).   In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

### A.      The Nature and Circumstances of the Offense

The visa fraud conspiracy described above is one of the largest bribery schemes involving a Foreign Service Officer in the history of the United States.  The defendant led and orchestrated a conspiracy of remarkable magnitude and sophistication involving: (1) purposefully cultivating a friendship with the Consulate official; (2) the use of shell email accounts and aliases to hide the identities of the conspirators; (3) the use of multiple IP addresses, including a VPN located in the United States, to avoid detection by authorities; (4) the use of agents and runners in Vietnam and in the United States to recruit customers and other recruiters to create distance between the customers and the defendant and to expand the scope of the conspiracy exponentially; (5) the laundering of millions of dollars in illegal proceeds through bank accounts in China; (6) the structuring of deposits into bank accounts in the United States and the use of several different bank accounts owned by family members in order to avoid detection by dispersing the proceeds of the conspiracy.

The defendant's scheme enabled hundreds of Vietnamese aliens to enter the United States without proper vetting. The defendant successfully compromised the U.S. Consulate in Ho Chi Minh City and was the leader of a scheme that paid millions of dollars in bribes and made millions more for himself. The defendant compromised the national security of the United States by subverting Department of State protocols. His actions were those of a sophisticated criminal who exploited the system and made millions of dollars after months of careful planning. As such, the defendant cannot claim to have suffered a momentary lapse in judgment. The scheme required meticulous planning, and the defendant used sophisticated means to try to cover up his crimes.

The defendant did not know the applicants. He provided false information on the visa applications to the Department of State. The defendant's crimes have had substantial implications for the State Department and its employees, both at the Consulate in Ho Chi Minh City and globally. He damaged the reputation of the State Department by tainting the process and likely preventing deserving applicants from obtaining visas. The State Department is dedicated to applying its immigration rules fairly without graft or corruption.

Moreover, the threat posed by the hundreds of Vietnamese aliens that the defendant and his conspirators allowed to enter the United States is unknown. The defendant, a United States Citizen, bears significant responsibility for this unknown threat. When he undermined the controls built into the visa issuance process, that is, when he created a scheme that guaranteed that people would receive a visa to enter the United States, he created a substantial risk that people having much more nefarious motives than the applicants in this case could have utilized the scheme to enter the United States and cause harm to this nation. Anyone with knowledge of the scheme could have exploited this vulnerability by blackmailing or otherwise coercing Sestak

to issue a visa to a designated individual, or to coerce BINH VO to provide false information to Sestak, knowing that whoever paid BINH VO would not be properly questioned or vetted. BINH VO's illegal conduct created harm beyond the corruption of a single consular officer -- it undermined the security of this nation.  A sentence at the high end of the agreed upon range is appropriate to reflect the scope and seriousness of the defendant's criminal conduct.

### B.    Role in the offense

As described above, the scheme perpetrated by the defendant and the other conspirators was hatched, designed, managed, operated, and controlled by the defendant.   While Michael Sestak was undoubtedly a critical participant, BINH VO was the leader and organizer.   The runners, money handlers, and other participants in the scheme were either related to the defendant, took directions from the defendant, or were paid by the defendant to perform tasks for the conspiracy.   Moreover, the proceeds of the conspiracy were managed and controlled by the defendant.   The defendant arranged for the proceeds to be laundered through individuals in Vietnam and bank accounts in China and elsewhere, and the defendant arranged for part of the proceeds to be paid to Sestak.  A sentence at the high end of the agreed upon range would reflect the defendant's leadership role in the conspiracy.

### C.    History and Character of the Offender

In May 2013, three of the defendant's co-conspirators – Sestak, the defendant's runner Truc Huynh, and the defendant's sister Hong Vo – were arrested on criminal complaints.  Upon their arrest, the defendant's scheme and his involvement literally became front page news in Vietnam, with new articles detailing the scheme appearing every day.   After this happened, the defendant suddenly resigned from his employment at a multi-national company and remained at large for months.  His wife withdrew over $ 7.7 million dollars from Vietnamese bank accounts.

He tried to make excuses for his sudden resignation by telling the probation officer that he did not intend to stay at that job long.  Certainly, he had no reason to stay after making millions illegally but did stay, only leaving and fleeing with his laptop after the scheme was publicly revealed.  Counsel for the defendant suggested to the probation officer that the defendant could have lived off the proceeds of this scheme after he left his job.  The defendant began using his email sparingly, and when he did access his email, he did so through a program that anonymized the IP Address from which it was accessed.  In one instance, the defendant accessed his email account from an IP Address in Cambodia, thereby indicating foreign travel from Vietnam to Cambodia by the defendant or intentionally masking his location by using an IP Address that link to Cambodia.  In either scenario, there is strong evidence that the defendant attempted to elude law enforcement and to avoid capture. The defendant is a shrewd, educated man.  He accepted all the rights and privileges of American citizens when he became a Naturalized U. S. citizen and took the oath to become a law abiding productive member of society.

> *I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, of whom or which I have heretofore been a subject or citizen; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I will bear arms on behalf of the United States when required by the law; that I will perform noncombatant service in the Armed Forces of the United States when required by the law; that I will perform work of national importance under civilian direction when required by the law; and that I take this obligation freely, without any mental reservation or purpose of evasion; so help me God"*

See also Section 337(a) of the Immigration and Nationality Act.

The defendant grew up in this country, went to college here, and started a business overseas.  His desire for wealth resulted in a betrayal of his adopted nation.  He betrayed his

alleged friendship with Sestak, initiating it only to "use" Sestak for visas.  BINH VO is a deceptive individual and uses people, as is evident in his cultivation of the false friendship with Sestak, using his cousin Truc Huynh to collect money, and using his family members to hide money.

Although BINH VO has accepted responsibility by entering a plea of guilty in this case, he has not been honest with the Court or the probation department regarding his financial status. The government's investigation and financial analysis has determined that between 2012 and 2013, as much as $16 million could have been deposited into the Vietnamese bank accounts controlled by BINH VO and Conspirator A.[12]  $3,173,378.18 was deposited into Conspirator A's Wells Fargo account in the United States and $341,000 was deposited into a J.P. Morgan Chase account held by BINH VO and Conspirator A.  The defendant did not report any of these illegal funds to the Internal Revenue Service on his 2012 tax return.

On or about January 22, 2013, agents from the Internal Revenue Service executed a seizure warrant ("the Michigan Seizure Warrant") on JPMC for funds up to $35,000 from JP Morgan Chase Account XXXXX5680 held in the names of the defendant and his sister, Conspirator K.V. and $245,000 from the defendant's JP Morgan Chase Account 5536.  This seizure was unrelated to DSS's visa fraud investigation, and was conducted solely based upon the structuring of funds to avoid currency reporting requirements, in violation of Title 31, United States Code,   Section 5324(a)(3).  According to the affidavit submitted in support of the Michigan Seizure Warrant, between May 3, 2012, and May 22, 2012, $280,000 was structured into JP Morgan Chase Account 5680 and JP Morgan Chase Account 5536.

---

[12] The $16 million figure does not account for the possibility of redeposit of cash withdrawn from other accounts.

The defendant retained an attorney in the Michigan Seizure Warrant matter and subsequently filed a claim for the seized funds.   The claim and supporting documents represented to the United States Attorney's Office for the Eastern District of Michigan that money seized from the defendant's accounts represented partial repayment of a 2007 loan in the amount of $450,000 that the defendant made to an individual in Vietnam, whom the defendant did not know very well. The claim further represented that: (1) the individual used the loan to purchase an apartment in Vietnam, and that after years of receiving no loan payments from the individual, the debtor informed the defendant that he would be repaid by family members of the debtor who were in the United States, and that the loan payment(s) would be deposited directly into the defendant's bank accounts; (2) the defendant did not have any contacts in Michigan; (3) the defendant did not direct anyone to structure deposits into his bank accounts; (4) the defendant did not know the loan payments had been made in cash; (5) the debtor paid the defendant a total of $280,000 in May 2012; and (6) the debtor made no additional loan payments to the defendant after May 2012 and the debtor had now disappeared.

The defendant signed the claim form, attesting "under penalty of perjury that… the information provided in support of my claim is true and correct to the best of my knowledge." The claim form also included language that stated that false statements may be subject to prosecution under 18 U.S.C. § 1001 and/or 18 U.S.C. § 1621.   DSS's investigation revealed, based on call records and interviews with the individual who made most of the deposits into the JPMC accounts, that the story submitted by the defendant in support of his claim for the seized funds was entirely fabricated.   Indeed, in the Statement of Facts submitted in support of the defendant's guilty plea, the defendant himself admitted that the funds seized by the IRS

represented payments for fraudulently issued visas adjudicated by Sestak during the course of the visa fraud conspiracy.

The government has obtained numerous emails and chats of the defendant and his co-conspirators that unequivocally establish the defendant's true nature and his orchestration of the bribery visa fraud conspiracy, including but not limited to: (1) his cultivation of his friendship with Sestak; (2) his use of a co-defendant as a middleman or runner to deal with the agents; (3) his use of anonymous email accounts and aliases; (4) his discussion of the price and his exit strategy from the scheme; (5) his discussion on how to disburse the proceeds to family members to avoid detection by law enforcement; (6) instructing others to structure cash deposits into his bank accounts and the accounts of his family members at multiple banks in the United States; (7) false statements on his tax return;  (8) false statements to the probation department; and (9) false statements to the government about his assets.   This is the true nature of BINH VO.  Faced with prison, his greed is still paramount.

    D.    **The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public**

Deterrence and promoting respect for the law should be a principal goal of the Court's sentence.  The Court's sentence can have a real deterrent effect on others contemplating similar bribery and visa fraud schemes.   The Defendant obviously has no respect for the law.   A sentence of 8 years (96 months) of incarceration will serve as a powerful warning to those who would seek to influence government employees and undermine national security measures for easy money.   The sentence will also have a major impact on government officials tempted by similar schemes.

**E.**     **The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

The Court should also consider the sentences of defendants with similar records that have been found guilty of similar conduct.   As previously mentioned, this was a massive bribery and visa fraud scheme in terms of the number of bribes, the number of visas, and the amount of money earned by the conspirators in only seven months.   The defendant planned the scheme to near perfection.  It was not the usual bribery scheme.  This Court imposed a sentence in United States v. Kerry Khan, Cr. No 11-276-1 (EGS), of 180 months of incarceration following a motion by the government for a departure pursuant to U.S.S.G. § 5K1.1. for a public official responsible for over $20 million in bribes and other conduct, such as assaulting his mistress and planning to travel to the Philippines to have sex with a minor that likely boosted his ultimate sentence.  A co-defendant, Michael Alexander, a public official responsible for over $1 million in bribes, was sentenced by this court to 72 months following a motion by the government for a departure pursuant to U.S.S.G. § 5K1.1.  Similarly, this Court sentenced another co-defendant, Harold Babb, a contractor responsible for over $7 million in bribes, to 87 months of incarceration following a motion by the government for a departure pursuant to U.S.S.G. § 5K1.1.  Also, in United States v. Rackley, 175 Fd. Appx. 564 (3d Cir. 2006), where the Court determined that the bribe amount was at least $1 million, the court sentenced the defendant to 90 months of incarceration following a guilty plea.  In this case, a sentence of 8 years (96 months) of incarceration would not result in an unwarranted sentence disparity among defendants with similar records who engaged in similar criminal conduct.

### III.    CONCLUSION

Wherefore, the government submits that the defendant should be sentenced to a term of 8 years (96 months) of incarceration followed by 3 years of supervised release, and that the defendant be ordered to forfeit $5,099,018.01.

Respectfully submitted,

VINCENT H. COHEN, JR.
Acting United States Attorney
D.C. Bar No. 471489


By:  _____/s/_____
Brenda J. Johnson
Assistant United States Attorney
D.C. Bar No. 370737
Brenda.Johnson@usdoj.gov
202-252-7801

Alessio D. Evangelista
Assistant United States Attorney
D.C. Bar No. 456715
Alessio.Evangelista@usdoj.gov
202-252-7247

Catherine K. Connelly
Assistant United States Attorney
Catherine.Connelly2@usdoj.gov
202-252-7732

May 27, 2015